PILLSBURY WINTHROP SHAW PITTMAN LLP
1540 Broadway
New York, NY  10036-4039
(212) 858-1000
Jeffrey R. Zuckerman
Andrew C. Smith

Attorneys for Defendant Morris Gad


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, )<br><br>Plaintiff, )<br><br>- against - )<br><br>MORRIS GAD and NATHAN ROSENBLATT, )<br><br>Defendants. ) | 07-CV-8385 (GEL)<br><br>ECF CASE<br>ELECTRONICALLY FILED |

## DEFENDANT MORRIS GAD'S MEMORANDUM OF LAW
## IN SUPPORT OF HIS MOTION TO DISMISS

## Table of Contents

Page

PRELIMINARY STATEMENT ................................................................................. 1

The Commission's Allegations ............................................................................. 2

The Public Information Not Referenced in the Commission's Complaint ............................ 6

    *June 17, 2004 NBTY Press Release Forewarning of a Disappointing Quarter* ...................... 6

    *Transcript of June 17, 2004 NBTY, Inc. Operations Update Conference Call* .................... 7

    *June 17, 2007 RBC Capital Markets Research Comment on NBTY: "NBTY Preannounces Sales Shortfall"* ........................................................................ 7

    *July 13, 2004 Business Wire – "Zacks Sell List Highlights:  NBTY, Inc."* ..................... 8

    *July 14, 2004 RBC Capital Markets Research Comment on NBTY, Inc. – "Continued Weakness in Wholesale:  Downgrading to Sector Perform"* ....................................... 8

    *July 21, 2004 US Fed News "NBTY Agrees to Pay $950,000 to Settle Claims that it Shipped Tablets used in Illegal Manufacturing of Methamphetamine"* ........................... 9

NBTY's Press Release of July 22, 2004 ................................................................ 10

I.   THE COMPLAINT MUST BE DISMISSED BECAUSE IT DOES NOT ALLEGE THE CIRCUMSTANCES CONSTITUTING FRAUD WITH PARTICULARITY. IT DOES NOT DETAIL WHAT MATERIAL, NONPUBLIC INFORMATION WAS ALLEGEDLY COMMUNICATED TO GAD ABOUT THIRD QUARTER RESULTS AND IT IS UNCLEAR AND CONFUSING ABOUT WHEN AND HOW SUCH INFORMATION WAS SUPPOSEDLY CONVEYED. ............................ 11

    A.   Applicable Legal Standards .................................................................... 11

    B.   The Complaint Fails to Satisfy Rule 9(b)'s Heightened Pleading Standard .............. 14

II. ANY INFORMATION ALLEGEDLY TIPPED TO GAD ABOUT THIRD QUARTER RESULTS WAS NOT MATERIAL NONPUBLIC INFORMATION IN VIEW OF WHAT WAS ALREADY PUBLIC ............................................................. 18

CONCLUSION ................................................................................................. 22

# PRELIMINARY STATEMENT[1]

Defendant Morris Gad ("Gad") moves, pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the insider trading complaint filed by the Securities and Exchange Commission ("Commission" or "SEC") because the complaint suffers from two fatal defects. First, it fails to allege with sufficient particularity what material, nonpublic information co-defendant Nathan Rosenblatt ("Rosenblatt"), a former director of NBTY, Inc. ("NBTY" or the "Company"), allegedly conveyed to Mr. Gad prior to the trades in question. Although the complaint alleges that Mr. Rosenblatt was aware of the Company's results for the fiscal third quarter ended June 30, 2004 ("Third Quarter"), it does not allege with any specificity what material nonpublic information he supposedly conveyed to Mr. Gad. This deficiency is particularly problematic given the deluge of negative news about NBTY that was already public, including, most importantly, the Company's pre-announcement on June 17, 2004, two weeks before the Third Quarter close, that results for April and May (the first two month of the Quarter) were below expectations and that this downward spiral would continue through the end of June 2004 and adversely impact overall Third Quarter results.

The Commission's complaint makes no reference to this widely disseminated public information. However, the Court can take judicial notice of what was in the public domain and give it due consideration on a motion to dismiss. When the allegations of the complaint are viewed in the context of what was public, the Commission's failure to plead the circumstances constituting fraud with particularity – specifically, the absence of any

---

[1]   Referenced exhibits are to those attached to the Declaration of Jeffrey R. Zuckerman in Support of Gad's Motion to Dismiss, dated October 15, 2007 ("Declar., Ex. __"). Emphasis added herein is our own, unless otherwise indicated.

detail regarding what was allegedly said to Mr. Gad about Third Quarter results coupled with confusing and inconsistent allegations regarding when and how this information supposedly was conveyed – warrants dismissal of the complaint under Rules 9(b) and 12(b)(6).

Second, even assuming the complaint could be construed to satisfy the pleading requirements of Rule 9(b), it must be dismissed as a matter of law because the very essence of what was announced – lower sales and earnings at NBTY, including at NBTY's wholesale division – was embodied in prior public disclosures and any differences in detail cannot be deemed material. As a result, two essential elements of insider trading – that the information allegedly communicated be both "nonpublic" and "material" – are not present here.

For the reasons stated, the complaint should be dismissed with prejudice.

### The Commission's Allegations

The SEC filed its complaint in this action on September 27, 2007 charging defendants Gad and Rosenblatt with "tipper" and "tippee" insider trading violations of Section 17(a) of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5. More specifically, the SEC alleges that "[i]n July 2004, Rosenblatt, a director of NBTY and member of its audit committee, tipped his close friend Gad with inside information about the company's significant revenue and earnings shortfall for its third quarter of 2004" and that Gad traded NBTY stock and options while in possession of this material nonpublic information and realized profits or avoided losses totaling approximately $400,000. Compl. ¶¶1, 6.

In support of its claim, the SEC makes the following additional allegations:

Rosenblatt received NBTY's financial results for the Third Quarter at 3:17 p.m. on July 20, 2004, via fax, from NBTY's chief financial officer ("CFO"). Compl. ¶¶2, 20. At 6:04 p.m. that day, the CFO faxed a draft press release to Rosenblatt concerning Third Quarter results. Compl. ¶21. As a result, the complaint alleges, Rosenblatt possessed the actual financial results for the Third Quarter of 2004 "by no later than the afternoon of July 20, 2004." Compl. ¶29.

As described in the SEC's complaint, the financial results showed a 12% decline in net income from the previous year's third quarter ($29.5 million versus $25.9 million), as well as a corresponding decline in earnings per share ($0.37 for 3Q 2004 versus $0.43 for 3Q 2003). Compl. ¶¶2, 22. According to the complaint, the results reflected a drop in sales in two divisions – "a slump in [NBTY's] U.S. retail and catalogue sales" – and a 5% decrease in profits of the Company's wholesale division as compared with the previous third quarter. Compl. ¶22. In addition, without providing any detail, the SEC alleges that "earnings per share were significantly lower than Wall Street's earnings per share estimate of $.50," Compl. ¶2, and that "NBTY's revenues were below analysts already lowered expectations." Compl. ¶22.

The complaint alleges that on the morning of July 21, 2004, Gad called Rosenblatt at 8:57 a.m., and Rosenblatt placed three calls to Gad within the next hour, with the last call occurring at 9:59 a.m. and lasting three minutes. Compl. ¶30. Thereafter, the SEC alleges, Rosenblatt attended a telephone conference of the audit committee which started at 11:00 a.m. and lasted an hour. Compl. ¶¶23, 31. Notably, the complaint does not allege that Rosenblatt learned anything new or different about Third Quarter results during this telephone conference than he allegedly already knew from the 3:17 p.m. fax of the

previous afternoon, July 20. It only alleges that the committee "approved the issuance of the financial results in the form of the press release previously circulated" at 6:04 p.m. on July 20. Compl. ¶31. Nevertheless, the SEC states that Gad called Rosenblatt the next day at 11:29 a.m., and then again at 12:50 p.m., and then called his broker at 12:52 p.m., with the unstated implication being that there must have been some connection between the timing of the audit committee meeting (at which apparently nothing new was learned), the timing of the calls during and after the audit committee meeting, and the call to Gad's broker. Compl. ¶31.[2]

The SEC further alleges that "[d]uring these communications [presumably referring to the phone calls] between Gad and Rosenblatt, *and possibly other communications*, Rosenblatt intentionally or recklessly, for his own direct or indirect benefit, and in breach of his fiduciary duty to NBTY, conveyed, in words or substance, the material, nonpublic information about NBTY's 2004 third quarter financial results to his close friend Gad." Compl. ¶32. The complaint does not specify the substance of what was supposedly communicated to Gad about the Third Quarter results or during which conversation or conversations it was supposedly conveyed. It makes only a vague, conclusory, reference to communication of "the material nonpublic information." That term is not itself defined. Moreover, the phrase "and possibly other communications" is not explained and is

---

[2]  The SEC has constructed its complaint to give the impression that there was a quick flurry of calls on July 21 during which inside information was passed, and an immediate call to the broker thereafter. In fact, when the allegations are analyzed carefully, almost a full day passed between the time it is alleged that Rosenblatt learned of the Third Quarter results and the alleged tip and trades. There is no allegation that Rosenblatt tipped his "close friend" Gad on July 20, 2004 before the market closed, which he obviously could have done if in fact, as alleged, he received Third Quarter results that afternoon. Although not a subject of this motion, the inference of insider trading based on the timing of the alleged trades is not nearly strong as the SEC implies. Because this is a motion to dismiss, we have not presented substantial evidence relating to Gad's trading patterns, the July Trades, or Gad's interaction with his broker, to negate any suggested inference of insider trading. Also, we have not at this time presented evidence to refute the allegation that Gad sold the entire position he controlled in NBTY.

inconsistent with, and, indeed, contradicts, the allegation in paragraph 14 of the "Summary" section of the complaint that "Rosenblatt's tipping of material, nonpublic information to Gad occurred during telephone conversations between them, as well as during a social evening over dinner, in Manhattan." Paragraph 35 alleges that on the evening of July 21, 2004, "Gad and Rosenblatt spent the evening together at a small dinner party to celebrate the birthday of a mutual friend," but it does not allege that any material nonpublic information was conveyed at this dinner. In fact, according to the complaint, by the evening of July 21st, the majority of the trades in question already were made.

The SEC alleges that on July 21, 2004, "beginning at 12:59 p.m., Gad sold his entire position of 13,920 NBTY shares at prices between $24.86 and $25 per share," sold short 30,000 shares, purchased 50 August 30 put contracts, and directed the sales of 35 August 20 call contracts. Compl. ¶¶33, 34. It is further alleged that on July 22, 2004, Gad sold short 10,000 shares, and bought 150 August 30 put contracts (collectively with the July 21, 2004 trades, the "July Trades"). Compl. ¶¶36, 37. The complaint does not address whether Gad continued to hold shares in his children's account.

NBTY made its Third Quarter announcement of financial results after the close of the market on July 22, 2004. Compl. ¶38. While the SEC alleges that NBTY's stock price was down 20% at the close of the market on July 23, 2004 from the prior day's closing price (Compl. ¶5), it fails to mention that on that day the entire Dow "opened sharply down," faltered throughout the day, and closed below 10,000 for the first time in two months, while the NASDAQ similarly dropped and closed at its lowest level that year. *See* PBS Nightly Business Report, Transcript #072300cb.118 (July 23, 2004) ("gloomy day on

Wall Street" continued "a summer of discontent" as "investors worr[ied] about earnings and the economy"). Declar., Ex. B.

### The Public Information Not Referenced in the Commission's Complaint

It is a matter of public record that in the weeks leading up to NBTY's July 22, 2004 announcement, there was a massive amount of negative information published about NBTY's declining financial performance in the Third Quarter and other significant problems at the Company. The highlights of these public disclosures included the following:

### *June 17, 2004 NBTY Press Release Forewarning of a Disappointing Quarter*

In a press release dated June 17, 2004, merely two weeks before the close of the Third Quarter, NBTY pre-announced lower April and May sales for two divisions, its Direct Response/Puritan's Pride unit and U.S. Retail/Vitamin World operations. Declar., Ex. C . The press release stated that "[s]ales from Puritan's Pride direct response/e-commerce operations for the two-month period ending May 31, 2004 decreased 12% … for the comparable two-month period a year ago," and "Vitamin World retail sales decreased 1% from the comparable two-month period a year ago." Significantly, NBTY Chairman and CEO Scott Rudolph stated: *"We are disappointed in the decline in sales results in two of our operations and expect this slowdown to continue at least through the end of June."* Rudolph warned that while management remained optimistic for the long-term, *"this slowdown in sales will [a]ffect our overall results for the fiscal third quarter."*

### *Transcript of June 17, 2004 NBTY, Inc. Operations Update Conference Call*

During a June 17, 2004 NBTY conference call following the Company's pre-

announcement, Declar., Ex. D , additional negative facts emerged.  Management disclosed

that NBTY was battling "pipeline fill" in its wholesale division from the acquisition of

Rexall roughly a year earlier.  As Chairman Rudolph acknowledged, "we had to take back

massive amounts of returns because the old management put products on the shelves that

didn't sell; you had some pipeline fill; you had returns.  There is so much confusion going

on to figure out exactly what's going on."  With respect to NBTY's retail business, the

Company's smallest division, management expressed a long-term concern (beyond the

quarter) about declining same store sales.  CFO Harvey Kamil stated, "if there's weakness

in the business and we don't see any sunlight at the end of the tunnel, it's more so with

U.S. retail operations than any of the other operations."

### *June 17, 2007 RBC Capital Markets Research Comment on NBTY: "NBTY Preannouces Sales Shortfall"*

Following NBTY's pre-announcement of a sales shortfall for the first two months

of the Third Quarter, and management's acknowledgement on the conference call of

problems with wholesale, RBC Capital Markets published a "Research Comment"

estimating that "three of [NBTY's] four divisions are tracking below expectations

(Wholesale, Direct, and Vitamin World)" and that "the wholesale business slowed in Q3,

with internal growth tracking in the single digits compared to expected double digit

growth."  Declar., Ex. E.  RBC revised its estimates and price target (while remaining

optimistic for the long-term), but it also emphasized that because ***the company does not***

***provide guidance*** or manage its business quarter to quarter ***it tends to report an earnings***

*miss approximately every 5-7 quarters*, only to be followed by a positive earnings surprise in the following quarter."

### *July 13, 2004 Business Wire – "Zacks Sell List Highlights: NBTY, Inc."*

On July 13, 2004, only eight days before the trades in question, Zacks.com published what it described as "details on a group of stocks that are part of their exclusive list of Stocks to Sell Now" and which are "currently rated as a Zacks Rank #5 (Strong Sell)." Declar., Ex. F. The first stock highlighted on the list was NBTY. The report stated: "In mid-June, NBTY announced lower sales for its Direct Response and Vitamin World operations for the two-month period ending May 31, 2004. The Company expected the slowdown to last through at least the end of June, and said it will impact its overall results for the fiscal third quarter." The report concluded that although the Company remains optimistic for the long term, in the short term "investors may want to wait for its earnings estimates to gain more upward momentum before taking a position."

### *July 14, 2004 RBC Capital Markets Research Comment on NBTY, Inc. – "Continued Weakness in Wholesale: Downgrading to Sector Perform"*

On the very next day, July 14, 2004, just a week before the July trades, RBC downgraded NBTY from "Outperform" to "Sector Perform" based on "continued weakness in Wholesale" and again lowered its estimates and price target. Declar., Ex. G. The Report explained that "[w]hile NBTY does not provide specific sales or earnings guidance, on June 17th management cited lower sales for April and May" and that "[t]hree of its four divisions underperformed...." Although RBC's main concern at the time was the "wholesale business," it believed that the problem was "confined to Rexall" and the integration of that business. However, the July 14 RBC report now referenced new data which suggested a worsening of wholesale performance for the Quarter. The report

emphasized that "recently received SPINs sell-through data for the four week period ending June 12th for sales in the mass channel (Food, drug and mass; excluding Wal-Mart) … revealed exceptionally weak retail sales for both Rexall and NBTY."  Specifically, they revealed a 20% decline for Rexall and a 40% decline for NBTY.  It concluded that "[t]he importance of the wholesale division, which comprises almost 50% of sales, and the magnitude of the decline is concerning."

### July 21, 2004 US Fed News "NBTY Agrees to Pay $950,000 to Settle Claims that it Shipped Tablets used in Illegal Manufacturing of Methamphetamine"

On top of this parade of negative financial news, on the morning of July 21, 2004, *the day the SEC alleges that Gad did most of his trading*, it was announced that NBTY agreed to settle civil charges brought by the United States Attorney's Office for the Eastern District of New York.  Declar., Ex. H.  The Justice Department's press release stated that NBTY violated the Controlled Substances Act by failing to give prior notice to the Drug Enforcement Administration ("DEA") of suspicious shipments of pseudoephedrine tablets and failing to obtain identification from individual customers to whom it sold these tablets.  According to the Justice Department's press release, pseudoephedrine tablets are used in small quanitities as cold medicine but in larger quantities in the illicit manufacture of methamphetamine.   The press release stated that on 385 occasions between January 1999 and May 2002, NBTY shipped large quantities of these tablets to customers, with some of the shipments exceeding 100,000 tablets, without giving prior notice to the DEA.  Further, the Company failed to obtain identification from customers on 8,377 shipments.  The press release noted that "[n]otwithstanding NBTY's violations," at least 14 of NBTY's customers had been arrested on criminal charges in seven states, and that illegal

manufacturing facilities were found at locations in three states to which NBTY shipped the tablets.[3]

## NBTY's Press Release of July 22, 2004

The Company's announcement of Third Quarter results on July 22 came after the market closed that day. Declar., Ex. I. The Company reported that overall Third Quarter sales increased 30% as compared with the prior third quarter and that net income dropped to $26 million versus $29 million for the prior third quarter ($0.43 to $0.37 per diluted share). However, the prior third quarter reflected "a $4 million after-tax benefit to record available foreign tax credits (representing $0.06 per diluted share)." In other words, the press release suggests that but for the $4 million one-time after-tax benefit to record foreign tax credits for the previous third quarter, net income would have been $25 million, not $29 million, or $1 million *less* than what was reported in the current Third Quarter. The company also reported that U.S. wholesale division sales increased 83% to $172 million from $94 million from the prior fiscal third quarter, and it reported a 2% decrease in Vitamin World sales ($53 million versus $54 million) from the previous third quarter and a pre-tax loss of $1 million. Finally, with regard to its Puritan's Pride operations, the Company reported a decline in revenues of 14% ($61 million versus $53 million).

Since NBTY did not forecast Third Quarter results, the press release did not make any comparison to previous forecasts. And, there was no reference whatsoever to any so-called analyst consensus number or a "Wall Street's earnings per share estimate."

The reported Third Quarter results were consistent with the Company's pre-announcement that Vitamin World and Puritan's Pride sales would be lower, its

---

[3] During late June and throughout July, there were also numerous class actions filed against NBTY. The class action filings were widely reported in the media.

subsequent acknowledgement that wholesale sales were a problem, and continuing analyst concerns about wholesale trends based on data which included all of April and May and nearly half of June.

## POINT I

**THE COMPLAINT MUST BE DISMISSED BECAUSE IT DOES NOT ALLEGE THE CIRCUMSTANCES CONSTITUTING FRAUD WITH PARTICULARITY. IT DOES NOT DETAIL WHAT MATERIAL, NONPUBLIC INFORMATION WAS ALLEGEDLY COMMUNICATED TO GAD ABOUT THIRD QUARTER RESULTS AND IT IS UNCLEAR AND CONFUSING ABOUT WHEN AND HOW SUCH INFORMATION WAS SUPPOSEDLY CONVEYED.**

In a case involving allegations of fraud, it is incumbent under the Federal Rules for a plaintiff to plead the circumstances constituting fraud with particularity. Fed. R. Civ. P. 9(b). This is no less true for the SEC than for any other plaintiff. *S.E.C. v. Pimco Advisors Fund Mgmt. LLC*, 341 F. Supp. 2d 454, 462 (S.D.N.Y. 2004). In an insider trading case, where the gravamen of the fraud is the communication of material nonpublic information in breach of a duty, this means that the SEC must detail in a meaningful way the material nonpublic information that was allegedly conveyed, and when and how it was communicated. The allegations should be clear and internally consistent. Because the SEC has failed to do this here, its complaint should be dismissed as a matter of law.

### A.    Applicable Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must set forth the grounds upon which his claim rests by making factual allegations sufficient "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007). Dismissal is proper if the complaint fails to set forth "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974. The "plausibility standard" is a

flexible one, "oblig[ing] a pleader to amplify a claim with some factual allegations in those

contexts where such amplification is needed to render the claim plausible." *Iqbal v. Hasty*,

-- F.3d --, 2007 WL 171803, at *11 (2d Cir. June 14, 2007). When the allegations in a

complaint, even if proven, still would not establish an entitlement to relief, "this basic

deficiency should be exposed at the point of minimum expenditure of time and money by

the parties and the court." *Bell Atl. Corp.*, 127 S. Ct. at 1966.

In order to state a claim for insider trading, the Commission is required to allege in

its complaint that material, nonpublic information was conveyed by the tipper to the tippee,

that the information was conveyed in breach of a duty of trust or confidence, or was

misappropriated, that the tipper received a benefit as a result of providing the information,

that the tippee was aware of the tipper's alleged breach or misappropriation, and that the

tippee traded while in possession of the information. *S.E.C. v. Warde*, 151 F.3d 42, 47 (2d

Cir. 1998) (citing *Dirks v. S.E.C.*, 463 U.S. 646, 654-64 (1983)); *S.E.C. v. Alexander*, 160

F. Supp. 2d 642, 650-51 (S.D.N.Y. 2001). Information is considered "material" if "a

reasonable investor would have viewed it as significantly altering the 'total mix' of

information available." *S.E.C. v. Mayhew*, 121 F.3d 44, 52 (2d Cir. 1997) (citing *TSC

Indus., Inc. v. Northway*, 426 U.S. 438, 449 (1976)).

Because insider trading is a form of fraudulent conduct prohibited by the federal

securities laws, the special pleading requirements of Rule 9(b) apply and a plaintiff must

plead "the circumstances constituting the fraud" with particularity. *ATSI Comms., Inc. v.

Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) ("Securities fraud claims are subject to

heightened pleading requirements that the plaintiff must meet to survive a motion to

dismiss"); *In re Global Crossing, Ltd. Secs. Lit.*, No. 02 Civ. 910 (GEL), 2005 WL

2990646, at *10 (S.D.N.Y. Nov. 7, 2005) (Lynch, J.) ("Insider trading like other fraudulent

and deceptive acts subject to liability under Section 10(b) and Rule 10b-5, is subject to the

heightened pleading requirements of Fed. R. Civ. P. 9(b), *not* the liberal notice-pleading

standard of Rule 8(a)").

In reviewing the sufficiency of a complaint, courts are not required to consider the

allegations in a vacuum. Rather, it is permissible, and sometimes essential, to consider

other salient matters that provide meaningful context. The matters that may be considered

include:

> (1) facts alleged in the complaint and documents attached to it or
> incorporated in it by reference, (2) documents "integral" to the complaint
> and relied upon in it, even if not attached or incorporated by reference, (3)
> documents or information contained in defendant's motion papers if plaintiff
> has knowledge or possession of the material and relied on it in framing the
> complaint, (4) public disclosure documents required by law to be, and that
> have been, filed with the Securities and Exchange Commission, and (5)
> facts of which judicial notice may properly be taken under Rule 201 of the
> Federal Rules of Evidence.

*In re Tower Automotive Sec. Lit.*, 483 F. Supp. 2d 327, 334 (S.D.N.Y. 2007) (Sweet, J.)

(internal citations omitted).[4] *See also Shah v. Meeker*, 435 F.3d 244, 246-248 (2d Cir.

2006) (considering news and media reports offered by defendants on motion to dismiss).

Under Rule 201, the court may take judicial notice of facts that are "not subject to

---

[4] *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("[O]n a motion to dismiss, a court may consider 'documents attached to the complaint as an exhibit or incorporated in it by reference ... matters of which judicial notice may be taken, or ... documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.'"); *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) ("For purposes of a motion to dismiss, we have deemed a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference ...."); *Int'l Audiotext Network, Inc. v. American Tel & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (where complaint relied heavily on agreement, it is considered "integral" to the complaint and court may consider its terms on a motion to dismiss); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) ("Where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated."; "[W]hen a district court decides a motion to dismiss a complaint alleging securities fraud, it may review and consider public disclosure documents required by law to be and which actually have been filed with the SEC....").

reasonable dispute" because they are either "generally known" or "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201.

### B.    The Complaint Fails to Satisfy Rule 9(b)'s Heightened Pleading Standard

The Commission's allegations of fraud do not satisfy the pleading requirements of Rule 9(b). The complaint is devoid of any specific allegations of the actual substance of the material nonpublic information that was allegedly conveyed by Rosenblatt to Gad, and it is vague, confusing and contradictory – at best – with respect to when and how such information was allegedly conveyed. More specifically, the complaint alleges that "the material nonpublic information" about Third Quarter results was conveyed (Complaint ¶32), but does not specify what information was communicated. The complaint details the contents of a draft press release Rosenblatt allegedly received about Third Quarter results (Complaint ¶¶21, 22), but does not allege that any specific matters discussed in this document were conveyed to Mr. Gad. The Complaint alleges that Third Quarter results were below analysts' already lowered forecasts (Complaint ¶22), and that earnings per share were significantly lower than Wall Street's estimate (Complaint ¶2), but does not allege that any of this information was known by or communicated to either Rosenblatt or Gad.[5]

The allegations regarding when and how material nonpublic information was allegedly communicated are equally deficient. Paragraph 14 alleges that the information was conveyed during telephone conversations and at a social dinner. However, the

---

[5] Further, there are no allegations detailing what the lowered Wall Street forecasts and estimates were and how they compared with actual Third Quarter results.

complaint does not detail the time, date or location of any social dinner at which it is claimed such information was conveyed. Paragraph 35 refers to a dinner party on the evening of July 21, but it does not allege that any nonpublic information was discussed. In fact, most of the trades in question are alleged to have occurred before the dinner party. Paragraph 31 alleges that material nonpublic information was communicated during a series of phone calls and "possibly other communications" but does not identify (either by time, date or location) any "other communications" in which this "possibly" occurred.

Moreover, there is no specification of what was said on which phone calls. The complaint refers to six calls on July 21 between Rosenblatt and Gad: one from Gad to Rosenblatt at 8:57 a.m.; three from Rosenblatt to Gad before 10:00 a.m.; another from Gad to Rosenblatt at 11:29 a.m., during the alleged audit committee teleconference; and another from Gad to Rosenblatt almost an hour after the audit committee conference call ended. There is no allegation that Rosenblatt learned any material nonpublic information during the conference call, only that the committee considered and approved the press release faxed to him the day before. So, we are left to speculate whether anything new or material was gleaned by Rosenblatt on the conference call, and left to guess on what call or calls the Commission contends Rosenblatt conveyed unspecified material nonpublic information about Third Quarter results.

"The failure ... to provide any *specific* description of the alleged inside information *or* when it was obtained is grounds in itself for dismiss[al] ... under Fed. R. Civ. P. 9(b)." *Stromfeld v. Great Atl. & Pac. Tea Co.*, 496 F. Supp. 1084, 1087 (S.D.N.Y. 1980). *See also Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F. Supp. 2d 435, 447 (S.D.N.Y. 2001) (dismissing insider trading claim where "Plaintiff has failed to provide

adequate specifics regarding the circumstances surrounding Defendants' possession of non-public information: e.g., among other things, what non-public information Plaintiff gave Defendants, when the information was given, etc."). While some cases have held that "the application of Rule 9(b) is 'relaxed' to allow circumstantial evidence to plead the specific content and circumstances of the insider tips," *S.E.C. v. Alexander*, 160 F. Supp. 2d 642, 649 (S.D.N.Y. 2001), Rule 9(b) nonetheless requires that the complaint "adduce specific facts supporting a strong inference of fraud or it will not meet even a relaxed standard." *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990). *See, e.g., In re Global Crossing, Ltd. Sec. Lit.*, No. 02 Civ. 910 (GEL), 2005 WL 2990646 (S.D.N.Y. Nov. 7, 2005) (Lynch, J.) ("Even under the 'relaxed' standard applied by some courts in [the context of pleading specific content and circumstance of insider tips], … Rule 9(b) requires that the complaint adduce specific facts supporting a strong inference of fraud."; granting motion to dismiss insider trading claim under Rule 9(b) where complaint failed to plead circumstances surrounding insider trading with sufficient particularity).[6]

Dismissal is especially appropriate here where so much information about Third Quarter performance was already in the public domain that it is unclear from the conclusory allegations of the complaint what information the Commission contends was conveyed to Gad that was material and nonpublic. The Company's pre-announcement on

---

[6]  *See also Energy Factors Inc. v. Nuevo Energy Co.*, No. 91 Civ. 4273, 1992 WL 170683, at *3 (S.D.N.Y. July 7, 1992) ("The particularity requirement of Rule 9(b) does not disappear for insider trading cases or for other cases where the facts concerning the alleged fraud are within the control of the defendants."). Cases that have found circumstantially pled facts supporting the content and circumstances of insider tips sufficient for purposes of Rule 9(b) are distinguishable from the instant case. *See, e.g., S.E.C. v. Ballesteros Franco*, 253 F. Supp. 2d 720, 732 (S.D.N.Y. 2003) (alleging sufficient circumstantial evidence regarding inside information with respect to nonpublic upcoming tender offer; no claim that any information regarding tender offer was already public); *Alexander*, 160 F. Supp. 2d at 654 (same); *Energy Factors Inc.*, 1992 WL 170683, at *4 (content of tip regarding increased proven oil reserves and production of new well adequately alleged; prior disclosure by company that new well would add to reserves *if* successful was distinguished from nonpublic information that well was actually productive).

June 17, 2004 of lower than expected results for the Quarter and all of the subsequently issued press releases, news stories and analysts reports appended to the accompanying Declaration are matters of which the Court may take judicial notice. *In re Tower Automotive Sec. Lit.*, 483 F. Supp. 2d at 334. When the allegations are viewed in this context, the pleading deficiencies are even more apparent.

We note also that the complaint does not allege facts often relied upon by the Commission to support an inference of fraudulent conduct, such as surreptitious communications, the use of nominee accounts, or other efforts at concealment. On the contrary, the complaint alleges that Rosenblatt and Gad were close friends and that their relationship was completely in the open. *See* Compl. ¶16 (Defendants "have been good friends for many years" and "live close to each other, speak to and see each other frequently, and vacation together with their families"); Compl. ¶35 (alleging that Gad and Rosenblatt attended a dinner party to celebrate the birthday of a mutual friend). Further, there is no suggestion of any attempt by Gad to conceal the trades in question. Indeed, the paucity of factual allegations supporting a "strong inference" of fraud is highlighted by the allegation in paragraph 7 that the defendants asserted a testimonial privilege during the SEC's investigation. *See* Compl. ¶7. The invocation of a Fifth Amendment privilege in the investigation is completely irrelevant and of no legal significance in this civil action.

For the reasons stated, the complaint fails to plead fraud with the requisite specificity and therefore should be dismissed.

## POINT II

### ANY INFORMATION ALLEGEDLY TIPPED TO GAD ABOUT THIRD QUARTER RESULTS WAS NOT MATERIAL NONPUBLIC INFORMATION IN VIEW OF WHAT WAS ALREADY PUBLIC

As discussed above, in order to meet its burden of proof in an insider trading case, the Commission must allege and prove that the information conveyed was both nonpublic and material. *SEC v. Warde*, 151 F.3d 42, 47 (2d Cir. 1998) (citing *Dirks v. SEC,* 463 U.S. 646, 654-64 (1983)). The Commission cannot meet this burden.

The extent of the information that was public before the trading alleged on July 21 and July 22 is detailed above. In view of what was indisputably public, nothing that Rosenblatt allegedly could have conveyed to Gad reasonably could be deemed material nonpublic information.

The critical piece is the June 17, 2004 NBTY press release that pre-announced disappointing results for the first two months of the Quarter and emphasized that the decline would continue in June and affect overall results for the Quarter. When that press release and the Chairman's ensuing statements regarding weakness in wholesale are combined with subsequently published analyst reports reporting further weaknesses in wholesale based on data up to and including June 12, it is difficult to imagine how the reporting of Third Quarter results significantly altered the mix.

The following chart illustrates the point:

| NBTY Division | June 17 Pre-announcement | July 22 Q3 press release | Difference |
|---|---|---|---|
| Direct Response/ Puritan's pride | 12% decline in sales | 14% decline in sales | 2% |
| U.S Retail/ Vitamin World | 1% decline in sales | 2% decline in sales | 1% |
| Wholesale | 94% *increase* in sales, but disclosure in analyst call about "channel stuffing," "pipeline fill" and "massive returns" from Rexall acquisition puts this number in question | 83% increase in sales | 11% |

As can be seen, the differences in the Direct Response and Puritan's Pride divisions (2% and 1% respectively) are negligible. The wholesale difference is greater but it is a reduction in the enormous percentage increase in wholesale sales from the prior third quarter, not a reduction in sales, and wholesale difficulties were disclosed during the June 17 conference call and were the subject of intense coverage in analyst reports by RBC which warned of concern (June 17) and increasing concern and weakness in that segment (July 14). Declar., Exs. E & G. Most importantly, NBTY's Chairman warned that the slowdown in sales would "continue at least through the end of June" and "will [a]ffect our overall results for the fiscal third quarter." Since the Company did not forecast earnings, there was no earnings miss or shortfall as compared with projections and no revised forecast or projections. Additionally, throughout the relevant period there was negative news about the filing of class actions against the Company and, at 8:35 a.m. on July 21, the day the alleged trading began, a press release announcing NBTY's civil settlement with the Justice Department for violations of the Controlled Substances Act.

This public record suggests that whatever nonpublic information the SEC claims that Rosenblatt communicated to Gad it could not have been significantly different from

what was already known. *See Elkind v. Ligget & Myers, Inc.*, 635 F.2d 156, 166 (2d Cir.

1980) (observing that materiality is judged according to information that is already public);

*TSC Indus., Inc. v. Northway*, 426 U.S. 438 , 439 (1976) (noting that materiality

"contemplate[s] ... a showing of a substantial likelihood that, under all the circumstances,

the omitted fact would have assumed actual significance in the deliberations of the

reasonable shareholder").

The *Elkind* case is instructive. There, the Second Circuit held that purported "tips"

made in advance of an earnings statement – that sales of the company's liquor product

would be adversely affected by distributors' inventory stockpiling and that its dog food

brand would lose market share to a new competitor – were immaterial because they merely

confirmed facts that "were fairly obvious to all who followed the stock." 426 F.2d at 439.

Similarly, in *SEC v. Hoover,* 9 F. Supp. 1135 (S.D. Tex. 1995), a corporation's

general counsel sold half of his shares in the company after the assistant comptroller told

the general counsel that the company's earnings "could be as much as 12 percent below the

prior year earnings rather than the 10 percent previously disclosed in the 3rd Quarter Form

10-Q." *Id.* at 1142. Since the company's prior disclosures in that year "showed a pattern

of declining earnings from continuing operations compared to the previous year," *id.* at

1145, the court concluded that "a zero to two percentage point incremental revision to the

year-end earnings estimate was not material as a matter of law." *Id.* at 1146.

Finally, in *SEC v. Bausch & Lomb, Inc.,* 420 F. Supp. 1226, 1237 (S.D.N.Y. 1976),

B&L's chairman had been interviewed by two brokerage analysts who were concerned

about the amount of adverse publicity ("flak") they had recently heard about the company,

namely, that B&L's highly profitable soft contact lenses were liable to become

contaminated, harming users' eyes. The chairman told the analysts that an earnings estimate of $5/share was too high, but that one of $3/share was too low; that two new products would not be introduced in the first quarter as had been anticipated; that sales of another product were no longer increasing week-to-week and would be lower than a prior estimate; and that B&L was revising its internal earnings estimate downward. *Id.* at 1234-35. Although the brokerage sold its B&L stock the next day, the court did not find that the remarks amounted to a disclosure of earnings. Further, the context of the interview – the analysts' prior concerns about "flak" – "[did] not permit characterization of the statements as disclosure of inside information." *Id.* at 1235. The court concluded that the remarks "[did] not rise to the level of disclosure of material, non-public information." *Id.*

In short, the July 22 announcement no doubt added some certainty and detail to what was known about the Company's Third Quarter performance, but the financial difficulties were well known and widely discussed publicly prior to July 22 and cannot be viewed as "significantly altering the total mix of information" previously available.

## CONCLUSION

For the reasons stated above, Defendant Morris Gad respectfully request the Court

dismiss the Commission's complaint with prejudice.


Dated:  October 15, 2007
        New York, New York

                    **PILLSBURY WINTHROP
                    SHAW PITTMAN LLP**


                    By: _____
                        Jeffrey R. Zuckerman
                        Andrew C. Smith
                        1540 Broadway
                        New York, NY  10036-4039
                        (212) 858-1000

                    *Attorneys for Defendant Morris Gad*