**SECURITIES AND EXCHANGE COMMISSION**
New York Regional Office
3 World Financial Center – Room 400
New York, New York 10281-1022
(212) 336-0175
Valerie A. Szczepanik
Audry Weintrob

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------x
                                                                     :
**SECURITIES AND EXCHANGE COMMISSION,**               :
                                                                     :
          **Plaintiff,**                                   :
                                                                     :
                                                                     :    **07-CV-8385 (GEL)**
      - against-                                            :    **ELECTRONIC FILING**
                                                                     :
**MORRIS GAD AND NATHAN ROSENBLATT,**              :
                                                                     :
          **Defendants.**                                 :
-----------------------------------------------------------------------x

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................................1

THE COMPLAINT'S ALLEGATIONS ....................................................................................2

ARGUMENT.............................................................................................................................3

I.      THE COMPLAINT SATISFIES RULE 9(b) BECAUSE IT ALLEGES WITH
        SUFFICIENT PARTICULARITY THE TIP FROM ROSENBLATT TO GAD...............3

        A. The Commission Need Not Allege the Exact Words Spoken to Allege a Tip ...............9

        B. The Commission Need Not Identify the Exact Mechanics of the Tip ..........................10

II.     THE COMPLAINT SATISFIES RULE 12(b)(6) BECAUSE IT PROVIDES ENOUGH
        FACTS OF DEFENDANTS' INSIDER TRADING TO CREATE A PLAUSIBLE
        CLAIM.............................................................................................................................13

        A. Plaintiff's Complaint States a Claim That is Plausible on its Face................................13

        B. The Media Reports Submitted by Defendants Should be Disregarded.........................15

        C. Should the Court Consider the Media Reports and Convert Defendants'
           Motion to One for Summary Judgment, the Court Should Deny Defendants' Motion.....17

                1. The Earnings Release Contained Material Information....................................18

                2. The Earnings Release Contained Non-Public Information ..............................23

III.    IF THE COURT GRANTS DEFENDANTS' MOTION, THE COMMISSION SHOULD
        BE AFFORDED AN OPPORTUNITY TO REPLEAD ...................................................23

CONCLUSION.........................................................................................................................24

# TABLE OF AUTHORITIES

## FEDERAL CASES

Ad-Hoc Comm. of Baruch Black & Hispanic Alumni Ass'n v. Bernard M. Baruch College, 835 F.2d 980 (2d Cir. 1987) ........................................................13

Baxter v. Palmigiano, 425 U.S. 308 (1976)...........................................................9

Bell Atl. Corp. v. Twombly, __ U.S. __, 127 S. Ct. 1955 (2007) ...........................13, 14

Benak v. Alliance Capital Mgmt. LP, 349 F. Supp. 2d 882 (D.N.J. 2004) ....................................15

Berk v. Tradewell, Inc., 2003 U.S. Dist. LEXIS 12078 (S.D.N.Y. July 16, 2003) .....................3, 4

In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410 (3rd Cir. 1997) ....................................18

Cofield v. Alabama Pub. Serv. Comm'n, 936 F.2d 512 (11th Cir. 1991) ....................................16

Credit & Fin. Corp. v. Warner & Swasey Co., 638 F.2d 563 (2d Cir. 1981) .................................3

Dirks v. SEC, 463 U.S. 646 (1983) ........................................................................14

Elkind v. Liggett & Myers, Inc., 635 F.2d 156 (2d Cir. 1980)......................................................18

Erickson v. Pardus, __ U.S. __, 127 S. Ct. 2197 (2007)..............................................................13

Ganino v. Citizens Utils. Co., 228 F.3d 154 (2d Cir. 2000) ........................................................23

In re Global Crossing, Ltd. Sec. Litigation, 2005 U.S. Dist. LEXIS 16942 (Nov. 7, 2005) ...........8

Global Network Commc'ns, Inc. v. City of New York, 458 F.3d 150 (2d Cir. 2006).............16, 17

Ieradi v. Mylan Labs., Inc., 230 F.3d 594 (3d Cir. 2000)..............................................................15

Iqbal v. Hasty, 490 F.3d 143 (2d Cir. 2007) ................................................................................13

Log on Am., Inc. v. Promethean Asset Mgmt. LLC, 223 F. Supp. 2d 435 (S.D.N.Y. 2001) .........................................................................................................7, 24

Luce v. Edelstein, 802 F.2d 49 (2d Cir. 1986)...............................................................................23

In re MBIA, Inc. Sec. Litig., 2007 U.S. Dist. LEXIS 10416 (S.D.N.Y. Feb. 13, 2007) ...............16

In re NAHC, Inc. Sec. Litig., 306 F.3d 1314 (3d Cir. 2002) ........................................................15

O'Brien v. Price Waterhouse, 740 F. Supp. 276 (S.D.N.Y. 1990), aff'd, 936 F.2d 674 (2d Cir. 1991) ............................................................................................................24

Penfield v. Venuti, 589 F. Supp. 250 (D. Conn. 1984)....................................................10

Rombach v. Chang, 355 F.3d 164 (2d Cir. 2004)..............................................4, 11, 12

Ross v. A.H. Robins Co., 607 F.2d 545 (2d Cir. 1979).....................................................3

SEC v. Alexander, 160 F. Supp. 2d 642 (S.D.N.Y. 2001)....................................4, 10, 11

SEC v. Bausch & Lomb, Inc., 420 F. Supp. 1226 (S.D.N.Y. 1976), aff'd, 565 F.2d 8 (2d Cir. 1977) .......................................................................................................18, 22, 23

SEC v. Benson, 657 F. Supp. 1122 (S.D.N.Y. 1987) ......................................................10

SEC v. Blackwell, 291 F. Supp. 2d 673 (S.D. Ohio 2003)...........................9, 10, 11, 12

SEC v. Blech, 2000 U.S. Dist. LEXIS 3507 (S.D.N.Y. Mar. 22, 2000)...........................4

SEC v. Cassano, 2000 U.S. Dist. LEXIS 15089 (S.D.N.Y. Oct. 11, 2000) ...................10

SEC v. Franco, 253 F. Supp. 2d 720 (S.D.N.Y. 2003) ...................................................11

SEC v. Herman, 2004 U.S. Dist. LEXIS 7829 (S.D.N.Y. May 5, 2004) ........................10

SEC v. Hoover, 903 F. Supp. 1135 (S.D. Tex 1995)......................................................22

SEC v. Invest Better 2001, 2005 U.S. Dist. LEXIS 34654 (S.D.N.Y. May 4, 2005)....................10

SEC v. Musella, 578 F. Supp. 425 (S.D.N.Y. 1984) .........................................................9

SEC v. Musella, 748 F. Supp. 1028 (S.D.N.Y. 1989) ....................................................12

SEC v. Palermo, 2001 U.S. Dist. LEXIS 15424 (S.D.N.Y. Oct. 2, 2001) .....................12

SEC v. Scott, 565 F. Supp. 1513 (S.D.N.Y. 1983), aff'd sub nom., SEC v. Cayman Islands Reinsurance Corp., 734 F.2d 118 (2d Cir. 1984) ..................................................9

SEC v. Softpoint, Inc., 958 F. Supp. 846 (S.D.N.Y. 1997), aff'd 159 F.3d 1348 (2d Cir. 1998) ..............................................................................................................10

SEC v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir. 1968).......................................23

SEC v. Thrasher, 1993 U.S. Dist. LEXIS 14970 (S.D.N.Y. Oct. 25, 1993)...................11

SEC v. U.S. Envtl., 82 F. Supp. 2d 237 (S.D.N.Y. 2000) ............................................3, 4

SEC v. Warde, 151 F.3d 42 (2d Cir. 1998)...............................................................14

San Francisco v. Tutor-Saliba Corp., 218 F.R.D. 219 (N.D. Cal. 2003) .......................................16

Shah v. Meeker, 435 F.3d 244 (2d Cir. 2006) ...............................................................16

Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124 (2d Cir. 1994) ......................................................4

Stromfeld v. Great Atl. & Pac. Tea Co., 496 F. Supp. 1084 (S.D.N.Y. 1980) ..........................6, 24

TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438 (1976) .................................................18, 22, 23

U.S. v. Gutierrez, 181 F. Supp. 2d 350 (S.D.N.Y. 2002) .........................................................12, 13

U.S. v. Southern Cal. Edison Co., 300 F. Supp. 2d 964 (E.D. Cal. 2004)...............................15, 16

Wexner v. First Manhattan Co., 902 F.2d 169 (2d Cir. 1990)..........................................................7

Wight v. Bankamerica Corp., 219 F.3d 79 (2d Cir. 2000) .............................................................23

Ziemba v. Wezner, 366 F.3d 161 (2d Cir. 2004).........................................................................17

## FEDERAL STATUTES

Fed. R. Civ. P. 9(b) ......................................................................................................3, 4

Fed. R. Civ. P. 56(c) .......................................................................................................17

Fed. R. Civ. P. 56(e) .......................................................................................................17

Fed. R. Evid. 201 .........................................................................................................15

Plaintiff Securities and Exchange Commission ("Commission") respectfully submits this memorandum of law in opposition to the motion of Defendant Morris Gad ("Gad") and Defendant Nathan Rosenblatt ("Rosenblatt") (collectively the "Defendants") to dismiss the Complaint.[1]

## PRELIMINARY STATEMENT

Defendants' Motion to Dismiss should be denied. The Complaint sets forth all the facts necessary to satisfy both Rule 9(b) and Rule 12(b)(6) because it alleges that Rosenblatt, an insider at NBTY Inc. ("NBTY"), in breach of his duty to NBTY, tipped his good friend Gad material, non-public information concerning the company's actual financial results for its third quarter of 2004, which Rosenblatt had received by virtue of his position as a director and member of NBTY's audit committee. The Complaint further alleges that Gad, knowingly or recklessly disregarding that Rosenblatt owed a duty to keep that information confidential, traded in NBTY securities while he was aware of the material, non-public information Rosenblatt passed to him.

Defendants argue that the Complaint does not allege the circumstances of the tip with particularity, i.e., that it does not detail what, when and how Rosenblatt tipped the information, and that any information tipped was not material and was already public. However, Defendants' arguments ignore the specific paragraphs of the Complaint that detail the material, non-public information passed. And, in arguing that the Complaint must contain even more details about the tip, Defendants ignore controlling precedent that has rejected similar attacks on Commission allegations.

---

[1] Defendant Gad filed a Memorandum of Law in Support of his Motion to Dismiss, which Defendant Rosenblatt joined. Defendant Gad's Memorandum will be referred to as "Defs. Br."

The Complaint adequately alleges the Commission's insider trading claim against Defendants. The media reports Defendants submit do not support their Motion to Dismiss and, in any event, are not properly considered by the Court on such a motion. Should the Court determine to consider the media reports, it must convert the Defendants' motion into one for summary judgment. However, a motion for summary judgment would be premature, and Defendants' arguments serve only to highlight the factual issues that must be resolved through litigation of this matter.

## THE COMPLAINT'S ALLEGATIONS

On September 27, 2007, the Commission filed this insider trading action against Gad and Rosenblatt in connection with Rosenblatt's tipping Gad and Gad's trading while aware of material, non-public information about NBTY. Rosenblatt, an insider at the company, received NBTY's financial results for its third quarter on July 20, 2004, two days before their scheduled release to the public after the close of the market on July 22, 2004. The results showed a 12% decline in net income from the previous year's third quarter, as well as a decline in earnings per share to $.37 from the previous year's third quarter earnings per share of $.43. This number was significantly lower than Wall Street's earnings per share estimate of $.50. (Compl. ¶¶ 1-2.) On July 21, 2004, Rosenblatt and Gad placed several telephone calls to each other. During these communications between Gad and Rosenblatt, Rosenblatt conveyed the material, non-public information about NBTY's 2004 third quarter financial results to Gad. (Compl. ¶ 32.) Within moments of the last telephone call, Gad called his broker and quickly placed a large bet that the price of NBTY stock would soon decline. (Compl. ¶ 3.) Specifically, during the two days prior to the company's public announcement of the financial results, Gad sold his entire position of 13,920 NBTY shares, sold short 40,000 NBTY shares, and purchased 200 NBTY put contracts.

Gad also sold a total of 105 NBTY call contracts from the accounts of his three children. These transactions created a significant risk of substantial losses to Gad if the price of NBTY stock were to rise rather than decline. (Compl. ¶ 4.)

On July 22, 2004, NBTY's stock price closed at $24.50 per share. As scheduled, NBTY announced its financial results for the 2004 third quarter after the market closed. The following day, July 23, 2004, the stock closed at $19.68 per share, down 20% from the prior day's closing. (Compl. ¶ 5.) By engaging in insider trading before the public disclosure of NBTY's disappointing financial results, Gad made trading profits and avoided losses of approximately $400,000. (Compl. ¶ 6.) Both Gad and Rosenblatt invoked their Fifth Amendment privilege against self incrimination and declined to testify during the Commission's investigation into this matter. (Compl. ¶ 7.)

**ARGUMENT**

## I.    THE COMPLAINT SATISFIES RULE 9(b) BECAUSE IT ALLEGES WITH SUFFICIENT PARTICULARITY THE TIP FROM ROSENBLATT TO GAD

The Complaint satisfies the requirements of Rule 9(b). Rule 9(b) requires that "[i]n all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity." Fed. R. Civ. P. 9(b). Rule 9(b) does not require the Commission to plead detailed evidence at this early stage of the litigation. SEC v. U.S. Envtl., 82 F. Supp. 2d 237, 240 (S.D.N.Y. 2000); accord Credit & Fin. Corp. v. Warner & Swasey Co., 638 F.2d 563, 566 (2d Cir. 1981); Ross v. A.H. Robins Co., 607 F.2d 545, 557 n.20 (2d Cir. 1979).

Review of a Rule 9(b) challenge involves the balancing of Rule 9(b) with both Fed. R. Civ. P. 8(a), which requires only a "'short and plain statement' of the claims for relief, and Fed. R. Civ. P. 8(f), which provides that 'all pleadings shall be construed as to do substantial justice.'" Berk v. Tradewell, Inc., 2003 U.S. Dist. LEXIS 12078, **37-38 (S.D.N.Y. July 16, 2003)

3

(quotations omitted). Rule 9(b)'s purpose is to "provid[e] a defendant with fair notice of a plaintiff's claim" and "safeguard[] a defendant's reputation from improvident charges of wrongdoing." U.S. Envtl., 82 F. Supp. 2d at 240 (citing Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994)).

Facts residing solely in the minds of the defendants need not be pled with the particularity otherwise required by Rule 9(b). Fed R. Civ. P. 9(b) ("Malice, intent, knowledge, and other condition of mind of a person may be averred generally."); Rombach v. Chang, 355 F.3d 164, 175 n. 10 (2d Cir. 2004) (plaintiff not required to specifically allege information "likely to be exclusively within the control of the defendants and the analysts"); see also Berk, 2003 U.S. Dist. LEXIS 12078, at **38-39 ("exclusive possession of the relevant information by the defendant is a ground for reading Rule 9(b)'s requirements permissively") (citing cases). In Commission insider trading cases, courts have routinely applied a relaxed Rule 9(b) standard because much of the specifics of how, where and when the information was transmitted are facts known only to the participants, and not to the Commission. SEC v. Alexander, 160 F. Supp. 2d 642, 649 (S.D.N.Y. 2001) ("[C]ircumstantial evidence [will be allowed] to plead the specific content and circumstances of insider tips.").[2]

The Complaint alleges the specific material, non-public information concerning NBTY's impending negative earnings announcement that NBTY entrusted to Rosenblatt by virtue of his position as a director and member of the audit committee:

---

[2]  Courts have applied a similarly relaxed Rule 9(b) standard in addressing Commission complaints alleging market manipulation. E.g., SEC v. Blech, 2000 U.S. Dist. LEXIS 3507, *8 (S.D.N.Y. Mar. 22, 2000) ("In a market manipulation claim, then, as opposed to an affirmative misrepresentation claim, 'the level of specificity required by Rule 9(b) is somewhat relaxed.'") (citations omitted).

20.    On July 20, 2004, at 3:17 p.m., NBTY's chief financial officer ("CFO"), faxed the members of the audit committee, including Rosenblatt, a reminder that a telephonic meeting of the audit committee would take place on July 21 at 11:00 a.m. The CFO attached for the audit committee's review the actual financial results for NBTY's 2004 third quarter.

21.    On July 20, 2004, at 6:04 p.m., the CFO faxed a draft press release concerning the 2004 third quarter financial results to the members of the audit committee, including Rosenblatt, for their approval.

22.    The financial results showed a 12% decline in NBTY's net income, from $29.5 million in the previous year's third quarter to $25.9 million, as well as a slump in its U.S. retail and catalogue sales. They also showed earnings per share of $.37, down from $.43 in the previous year's third quarter. Though sales in the wholesale division increased by 83% from the previous year's third quarter, profits for the division actually decreased by 5%. NBTY's revenues were below analysts already lowered expectations.

23.    On July 21, 2004, the audit committee members met at 11:00 a.m. for an hour and approved the financial results and the press release.

24.    On July 22, 2004, the company announced its third quarter results after the close of trading.


The Complaint further alleges, with sufficient specificity, the details of Rosenblatt's tip to

Gad:

29.    As noted above, by no later than the afternoon of July 20, 2004, Rosenblatt possessed the actual financial results for the third quarter of 2004, which reflected the lower sales figures for two of the four divisions and the earnings decline. He also had a copy of the press release that the company intended to issue.

30.    The following morning, July 21, 2004, at 8:57 a.m., prior to that day's scheduled audit committee meeting, Gad called Rosenblatt. Within the next hour, Rosenblatt placed three calls to Gad, the last of which was at 9:59 a.m. and lasted 3 minutes.

31.    At 11:00 a.m. on July 21, 2004, the audit committee had a one-hour telephonic conference, during which it approved the issuance of the financial results in the form of the press release previously circulated. At 11:29 a.m. and again at 12:50 p.m., Gad placed calls to Rosenblatt. Two minutes after the second call, at 12:52 p.m., Gad called his broker.

32.    During these communications between Gad and Rosenblatt, and possibly other communications, Rosenblatt intentionally or recklessly, for his own direct or indirect benefit, and in breach of his fiduciary duty to NBTY, conveyed, in words or in substance,

the material, nonpublic information about NBTY's 2004 third quarter financial results to his close friend Gad. Some or all of these communications took place while Gad was at his offices in Manhattan.

*    *    *

35.    Later that evening, Gad and Rosenblatt spent the evening together at a small dinner party to celebrate the birthday of a mutual friend.

The Complaint also alleges that Rosenblatt tipped Gad in violation of his duties as a director and member of NBTY's audit committee, and that Gad knew, or was reckless in not knowing, that this was the case. (Compl. ¶¶ 26-28.) The Complaint details Gad's trading in NBTY, the timing of which coincided with Gad's alleged contacts with Rosenblatt. (Compl. ¶¶ 33-34, 36-39.) Gad's trading strategy – a risky one, unless he knew the stock price would fall – secured for Gad $400,000 in trading profits and losses avoided. (Compl. ¶¶ 40-44.) The specifics of the tip alleged in the Commission's Complaint against Defendants dramatically differs from the nebulous allegations of "inside information" found lacking in the private litigation cases relied upon by Defendants.

In Stromfeld v. Great Atl. & Pac. Tea Co., 496 F. Supp. 1084 (S.D.N.Y. 1980), cited by Defendants, the court dismissed an amended complaint for insider trading because it "fail[ed] to identify with any specificity the material inside information that purportedly should have been but was not disclosed." 496 F. Supp. at 1087. The allegations in the Stromfeld complaint referred only to "inside information contained in the files" and "confidential business data," without providing any "specific description of the alleged inside information or when it was obtained." Id. The Commission's Complaint here specifically describes the material, non-public information Rosenblatt tipped to Gad: NBTY's actual financial results for its 2004 third quarter, which showed a decline in net income, a slump in sales, a decrease in earnings per share and revenues below analysts' expectations. (See Compl. ¶ 22.)

6

Defendants also rely on <u>Wexner v. First Manhattan Co.</u>, 902 F.2d 169, 172 (2d Cir. 1990), in which the plaintiff claimed individuals at her brokerage firm leaked confidential information regarding her intention to sell a large block of stock of her family's company. The Second Circuit affirmed the district court's dismissal because the complaint was devoid of "any allegations as to who leaked [plaintiff's] plans, or when and to whom the information was leaked." 902 F.2d at 172. <u>Wexler</u> prescribes that "a complaint must adduce specific facts supporting a strong inference of fraud or it will not satisfy even a relaxed pleading standard." <u>Id.</u> Here, the Complaint's specific allegations that Rosenblatt tipped Gad with information regarding NBTY's third quarter financial results during contacts between the two on or about July 21, 2004, (Compl. ¶¶ 29-32, 35), meet that prescription, in that they "provide a factual basis from which an inference of fraud can be drawn." 902 F.2d at 173.

Similarly, Defendants rely on <u>Log on Am., Inc. v. Promethean Asset Mgmt. LLC</u>, 223 F. Supp. 2d 435, 447 (S.D.N.Y. 2001), to no avail. There, a corporation claimed that certain asset managers and investment advisors artificially manipulated market prices for the corporation's securities in connection with a securities purchase agreement among the parties. 223 F. Supp. 2d at 438. Specifically, plaintiff alleged that defendants "artificially manipulate[ed] the market prices of [plaintiff's] common stock through massive and unlawful short sales while in possession of material non-public information concerning [plaintiff's] business." <u>Id.</u> at 441. The complaint pleaded only that plaintiff provided defendants access to "confidential non-public information, relating to their financing options, business plans and contingent liabilities." <u>Id.</u> at 447. The court dismissed the complaint because it did not identify "what information, when and to whom and by whom it was provided ...". <u>Id.</u> Here, the Commission's Complaint unambiguously alleges that during phone calls and possibly other communications between the

7

defendants, Rosenblatt (NBTY's director and audit committee member) communicated non-public information to Gad, who shortly thereafter executed trades that netted profits for Gad and his family. (See Compl. ¶¶ 29-44.) Furthermore, the Complaint alleges that the material, non-public information consisted of NBTY's third quarter 2004 results, which were lower than market analysts' predictions. (See Compl. ¶¶ 21, 22, 29.)

Defendants' reliance on In re Global Crossing, Ltd. Sec. Litig., 2005 U.S. Dist. LEXIS 26942 (Nov. 7, 2005) (Lynch, J.), also is misplaced. There, plaintiff investors alleged insider trading against CIBC, based on access CIBC purportedly had to Global Crossing's "internal financial material" by virtue of CIBC's "control" over Global Crossing. 2005 U.S. Dist. LEXIS 26942, **24-31. The Court held that, while the plaintiffs' allegations of CIBC's stock ownership, appointment of five board members, and possession of a stockholder agreement with limited powers were adequate to plead CIBC's control over Global Crossing, they were insufficient to support a strong inference that CIBC had access to inside information and were aware of fraud at Global Crossing. Id. at **25, 30-33. Here, by contrast, the Commission need not infer Defendants' access to inside information; the Commission has alleged that Defendants had direct knowledge of NBTY's actual financial results because those results were entrusted by NBTY to Rosenblatt, who then passed them to Gad. (Compl. ¶¶ 20-21.)

The Commission's Complaint has satisfied the Second Circuit's interpretation of § 9(b), requiring that fraud allegations be stated with particularity. The Commission's Complaint adequately identifies the material, non-public information accessed, and how and when it was received and transmitted.

8

**A.    The Commission Need Not Allege the Exact Words Spoken to Allege a Tip**

The Commission need not offer the words spoken to allege a tip under Rule 9(b).  As one

court has noted, to the extent that Rule 9(b) requires specifics of the statements alleged to be

fraudulent, in an insider trading case, the Rule requires only that the Commission plead the

substance of the tip:

> This general rule [that a plaintiff allege with particularity the content of an alleged
> misrepresentation], however, is based on the typical fraud case, where a plaintiff
> has relied, to his or her detriment, on a fraudulent statement made by the
> defendant to the plaintiff.  In such a case, the content of the misrepresentation is
> clearly within the plaintiff's knowledge, and particular information concerning the
> circumstances in which the misrepresentation was made must be provided in
> order to avoid the very real danger that a defendant might be left unaware of the
> basis for the plaintiff's claims. . . .  Here, however, the exact terms that [the
> tipper] might have used to inform his family members and friends that [the target
> company] was about to be acquired by [another company], which would cause the
> price of [the target]'s stock to rise substantially, are relatively unimportant.  The
> Complaint has alleged, via inference, that [the tipper] provided the tippees with
> enough information about the acquisition to convince them to purchase [the
> target] stock.  [citations omitted]  Any further information about the contents of
> the conversations is not necessary.

SEC v. Blackwell, 291 F. Supp. 2d 673, 690-91 (S.D. Ohio 2003) (internal citations omitted).

Indeed, this reasoning is especially cogent when, as here, the Defendants refused to answer

questions concerning the tip during the Commission's investigation of this case, invoking their

Fifth Amendment privilege not to testify.[3]  (Compl. ¶ 7.)  To permit Defendants' use of the

---

[3]  Defendants claim: "The invocation of a Fifth Amendment privilege in the investigation is
completely irrelevant and of no legal significance in this civil action." (Defs. Br. at 17.) To the
contrary, it has long been established that in civil cases, including Commission enforcement
actions, a defendant's invocation of the Fifth Amendment privilege and refusal to testify can be
considered by a fact finder. See Baxter v. Palmigiano, 425 U.S. 308, 317-18 (1976). An adverse
inference has been regularly drawn against a defendant who has asserted the Fifth Amendment
privilege in Commission actions. See, e.g., SEC v. Scott, 565 F. Supp. 1513, 1533 (S.D.N.Y.
1983) (granting permanent injunctive relief, drawing adverse inference from fact that defendant
invoked Fifth Amendment privilege not to testify), aff'd sub nom., SEC v. Cayman Islands
Reinsurance Corp., 734 F.2d 118 (2d Cir. 1984); SEC v. Musella, 578 F. Supp. 425, 429
(S.D.N.Y. 1984) (granting preliminary injunction and asset freeze where defendants asserted

privilege both as a shield during the investigation and as a sword in litigation would be unjust.

Cf. Penfield v. Venuti, 589 F. Supp. 250, 255 (D. Conn. 1984) (permitting adverse inference

against a party who invokes the Fifth prevents use of the privilege as a weapon in civil

litigation).  Rosenblatt and Gad are the best (and perhaps only) people to know the exact

communications that transpired between them.  After denying the Commission their testimony

during its investigation, Defendants cannot now be heard to complain that the Commission need

aver the exact details of Rosenblatt's tip to Gad.  To require the Commission to state exactly

what transpired in Defendants' private communications would be to "demand clairvoyance" of

the Commission.  Accord Blackwell, 291 F. Supp. 2d at 691.

## B.    The Commission Need Not Identify the Exact Mechanics of the Tip

As applied by this Court in other Commission cases, Rule 9(b) does not require the

Commission to specify the precise mode, or even dates, of the transmission of the tips between a

tipper and tippee.  In Alexander, for example, the Court rejected certain defendants' Rule 9(b)

motion, ruling that the complaint adequately alleged communications between a tippee and his

sons, even though it included few specifics about the dates on which the tips occurred, their

---

Fifth); SEC v. Benson, 657 F. Supp. 1122, 1129 (S.D.N.Y. 1987) (where defendants invoked the
Fifth, court entered preclusion order and summary judgment against defendants); SEC v.
Softpoint, Inc., 958 F. Supp. 846, 856-860 (S.D.N.Y. 1997) (where defendant testified in
investigation, but asserted the Fifth in subsequent litigation, court entered preclusion order, drew
adverse inference and granted summary judgment against defendant), aff'd 159 F.3d 1348 (2d
Cir. 1998);  SEC v. Invest Better 2001, 2005 U.S. Dist. LEXIS 34654, *6 (S.D.N.Y. May 4,
2005) (where defendant asserted Fifth, court entered preclusion order, drew adverse inference
and granted summary judgment against defendant); SEC v. Cassano, 2000 U.S. Dist. LEXIS
15089, *5 & n.1 (S.D.N.Y. Oct. 11, 2000) (in insider trading case, denying defendants' motion
for summary judgment by, among other things, drawing inference from defendants' assertion of
the Fifth during the Commission's investigation preceding litigation); SEC v. Herman, 2004 U.S.
Dist. LEXIS 7829, *20 (S.D.N.Y. May 5, 2004) (allowing inference from defendants'
invocations of the Fifth during Commission's investigation, even though they later testified in
depositions).

substance or the means of communication. There, the complaint merely alleged that the father,

Patrick J. Rooney, himself a tippee, had passed material, non-public information to his sons, and

that one of his sons had later passed additional information on to the other. Alexander, 160 F.

Supp. 2d at 647. Neither the specifics of the conversations in which the defendants

communicated, nor the precise dates of such conversations, nor how the conversations took place

– by phone, in person, by e-mail – was alleged in the complaint. Id. ("In December 1994, John

R. Rooney tipped his brother Patrick G. Rooney . . . .") Nonetheless, the Court ruled that the

allegations satisfied 9(b): "[T]he allegations in the Complaint concerning the timing of the

communications among John R. Rooney, Patrick J. Rooney and Patrick G. Rooney, together with

the allegations concerning the timing of Patrick G. Rooney's purchase of ... securities, suffice at

this stage of the litigation to survive the motion to dismiss." Id. at 653; accord SEC v. Franco,

253 F. Supp. 2d 720, 724, 732 (S.D.N.Y. 2003) (allegation that insider tipped his brother

"between June 18 and June 24" through unspecified means with information relating to tender

offer satisfied Rule 9(b)); SEC v. Thrasher, 1993 U.S. Dist. LEXIS 14970, ** 6-7 (S.D.N.Y. Oct.

25, 1993) (allegations that remote tippee defendant received "some or all of" the material, non-

public information from another tippee and traded on specific dates satisfied Rule 9(b) and

constituted sufficient notice of plaintiff's claims); see also Blackwell, 291 F. Supp. 2d at 690

(even without specific allegations of means of communications, content, or precise dates as to

some of the communications with tippees, complaint adequately described the times and places

of communication of material, non-public information and the circumstances involved to comply

with Rule 9(b))[4]; cf. Rombach, 355 F.3d at 175 & n. 10 (Rule 9(b) did not require private

---

[4]  In Blackwell, the court ruled that the fact that the complaint failed to allege the specific dates
of some of the communications ("in late August 1999"; "during other conversations in
September 1999"; "shortly after her year-end performance review"; "at various other points

11

securities litigation plaintiff to allege "when and where [the fraudulent] statements were made"
because the "method by which defendants conveyed the fraudulent information . . . at least at this
early stage in the litigation . . . is likely to be exclusively within the control of defendants. . . .").[5]

By their nature, insider trading cases involve deception and concealment. Rarely does
direct evidence exist of the type Defendants insist must appear in a complaint, even after
discovery and on summary judgment. Nonetheless, courts accept that it may be by
circumstantial evidence, not direct evidence, that the Commission will prove its case. See SEC
v. Palermo, 2001 U.S. Dist. LEXIS 15424 (S.D.N.Y. Oct. 2, 2001) (rejecting defendant's motion
for summary judgment based on Commission's circumstantial evidence that size of alleged
tippees' investment and parallel nature of his trades with those of tipper were sufficient to create
a triable issue of fact); SEC v. Musella, 748 F. Supp. 1028, 1038-39 (S.D.N.Y. 1989) (inference
that tippee knew or should have known that he was trading on stolen, non-public information
was appropriate where Commission offered circumstantial evidence of tippee's parallel trading
with tipper, amounts involved suggested tippee's confidence in the accuracy of the information
received and his offered explanations for the trades were incredible); cf. U.S. v. Gutierrez, 181 F.
Supp. 2d 350, 354 (S.D.N.Y. 2002) (in ruling on defendant's motion to exclude evidence of
relatives' trades from criminal trial, court ruled that inference of insider trading scheme arose

---

during September 1999"), or the means or location of the communications ("presumably at the
offices"; "during [unspecified ] other conversations") did not render it deficient as to those
defendants. Blackwell, 291 F. Supp. 2d at 690. "Given that the SEC was not a party to any of
these conversations, it has adequately described the times and places that they occurred, and the
circumstances involved." Id.

[5]  In Rombach, the Second Circuit agreed with the lower court that the investor had not properly
alleged why the statements were fraudulent and, on that basis, affirmed the dismissal of the
complaint. Rombach, 355 F.3d at 175.

from evidence of "the family relationships, the temporal proximity of the trades to the [tipper's]

receipt of inside information and to each other, and even the size of the trades").

## II.    THE COMPLAINT SATISFIES RULE 12(b)(6) BECAUSE IT PROVIDES ENOUGH FACTS OF DEFENDANTS' INSIDER TRADING TO CREATE A PLAUSIBLE CLAIM

### A.    Plaintiff's Complaint States a Claim That is Plausible on its Face

On a Motion to Dismiss under Rule 12(b)(6), the Court should read the Complaint with

"the assumption that all the allegations in the complaint are true," Bell Atl. Corp. v. Twombly,

__ U.S. __, 127 S. Ct. 1955, 1965 (2007),[6] and all inferences should be drawn in favor of the

plaintiff, Ad-Hoc Comm. Of Baruch Black & Hispanic Alumni Ass'n v. Bernard M. Baruch

Coll., 835 F.2d 980, 982 (2d Cir. 1987). A plaintiff is not required to set out in detail the facts on

which it bases its claims. Twombly, 127 S. Ct. 1964-65. All that is necessary is a short and

plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is

and the grounds upon which it rests. Erickson v. Pardus, __ U.S. __, 127 S. Ct. 2197, 2200

(2007) (citations omitted). Taking the allegations in the Complaint as true, it alleges facts that

plausibly state a claim that Rosenblatt and Gad violated Section 17(a) of the Securities Act,

Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5 by insider trading.

As the Second Circuit recently made clear, to withstand a motion to dismiss, the

complaint must set forth sufficient factual allegations "to render a claim *plausible*." Iqbal v.

Hasty, 490 F.3d 143, 158 (2d. Cir. 2007) (emphasis in original). Plausible grounds to infer a

---

[6] Bell Atl. Corp. v. Twombly, __ U.S. __, 127 S. Ct. 1955 (2007), considered the sufficiency of a complaint charging an antitrust conspiracy. Whether Twombly has any application to complaints outside the antitrust conspiracy context is unclear. See Iqbal v. Hasty, 490 F.3d 143, 156 (2d Cir. 2007). But even if it were meant to apply broadly to all complaints, Plaintiff's Complaint meets its standard because it pleads enough facts "to state a claim to relief that is plausible on its face." Twombly, 127 S. Ct. at 1974.

violation of the securities laws does not "impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [the violation]." Twombly, 127 S. Ct. at 1965.

The parties do not dispute what is required to state a claim for insider trading. Specifically, as set forth in SEC v. Warde, 151 F.3d 42, 47 (2d Cir. 1998), the Commission must allege in its Complaint that: (1) Rosenblatt possessed material, non-public information regarding NBTY; (2) Rosenblatt disclosed this information to Gad; (3) Gad traded in NBTY securities while in possession of that non-public information provided by Rosenblatt; (4) Gad knew or should have known that Rosenblatt violated a relationship of trust by relaying NBTY information; and (5) Rosenblatt benefited by the disclosure to Gad. See Warde, 151 F.3d at 47 (citing Dirks v. SEC, 463 U.S. 646, 654-64 (1983)). The Complaint states a claim because, in light of the facts alleged -- the close relationship between Rosenblatt and Gad, Rosenblatt's knowledge by virtue of his position in NBTY of material, non-public facts regarding NBTY's impending negative earnings announcement, the timing of the contacts between Rosenblatt and Gad and Gad's trades prior to that information's public disclosure -- there is a "reasonable expectation that discovery will reveal evidence of" insider trading. Twombly, 127 S. Ct. at 1965. The Complaint does not offer only "labels and conclusions, and a formulaic recitation of the elements of a cause of action." Id. Rather, it charges Rosenblatt with tipping, and Gad with trading on, the specifics of the impending negative earnings announcement. Those allegations "raise a right to relief above the speculative level." Id.[7]

---

[7] This is not a case like the one at issue in Twombly, where the Court was asked to infer unlawful conduct from facts that were just as consistent with lawful conduct as unlawful conduct. In Twombly, the plaintiff alleged an antitrust conspiracy by pointing to parallel conduct. Twombly, 127 S. Ct. at 1966. But, as the Court noted, parallel conduct could "just as well be independent action," id., and without more, it raised only the possibility of an illicit

**B.    The Media Reports Submitted by Defendants Should be Disregarded**

Although moving for relief under Rule 12(b)(6), Defendants have submitted numerous

media reports extraneous to the Complaint in support of their motions.  Defendants urge the

Court's consideration of the media reports on the grounds that the Court can take judicial notice

of such reports under Rule 201 of the Federal Rules of Evidence.[8]  Rule 201 permits courts to

take judicial notice of adjudicative facts that are "not subject to reasonable dispute," so that they

are "either (1) generally known within the territorial jurisdiction of the trial court or (2) capable

of accurate and ready determination by resort to sources whose accuracy cannot reasonably be

questioned." Fed. R. Evid. 201.

Under Rule 201, courts have taken judicial notice of such things as stock price quotes, or

the general meaning of words.  See In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1331 (3d Cir.

2002) (district court did not err when it took judicial notice of stock price data compiled by Dow

Jones); Ieradi v. Mylan Labs., Inc., 230 F.3d 594, 600 (3d Cir. 2000) (court may take judicial

notice of stock prices that are reported by "a source whose accuracy cannot be reasonably

questioned"); U.S. v. Southern Cal. Edison Co., 300 F. Supp. 2d 964, 975 (E.D. Cal. 2004)

("court may take judicial notice of the general meaning of words, phrases, and legal

expressions").  But, documents are judicially noticeable only for the purpose of determining

---

agreement. Here, taken as true, Defendants' acts are unlawful on their face, and are completely
inconsistent with lawful conduct.

[8] Defendants do not argue, nor could they, that the court should take judicial notice of the
submitted media reports on the basis that they are integral to the Commission's Complaint. See,
e.g., Benak v. Alliance Capital Mgmt. LP, 349 F. Supp. 2d 882, 889 (D.N.J. 2004) (when
complaint itself relied on relevant media articles, court considered news articles on motion to
dismiss because plaintiffs "brought that universe of 'relevant articles' within the Court's
purview"). The Commission's Complaint does not rely on media reports; rather, it is the
Defendants who attempt to bring news articles into the court's purview.

what statements are contained therein, not to prove the truth of the contents or a party's assertion

of what the contents mean. Global Network Commc'ns, Inc. v. City of New York, 458 F.3d 150,

157 (2d Cir. 2006) (citing cases); accord Southern Cal. Edison, 300 F. Supp. 2d at 975 (citing

cases). Defendants attempted use of extraneous media reports here, to support their position that

the information contained therein rendered Rosenblatt's tip to Gad public or non-material, is

therefore not appropriate under the judicial notice exception. See Global Network, 458 F.3d at

157.

   Defendants cite Shah v. Meeker, 435 F.3d 244 (2d Cir. 2006), in support of their position

that a court may consider news and media reports on a motion to dismiss. However, Shah – and

other cases that have considered media articles on a motion to dismiss – considered such reports

for the purpose of showing whether plaintiffs were on "inquiry notice" of a claim for purposes of

determining whether the claim was time-barred under a statute of limitations. See Shah, 435

F.3d at 249; see also, In re MBIA, Inc. Sec. Litig., 2007 U.S. Dist. LEXIS 10416, **20-23

(S.D.N.Y. Feb. 13, 2007) (citing cases). Although courts have taken judicial notice of media

reports to determine whether a party received notice of the facts alleged in the complaint, courts

will not take judicial notice of such reports when offered for more than that because the contents

and meaning of such reports are subject to reasonable dispute. See, e.g., Cofield v. Alabama

Pub. Serv. Comm'n, 936 F.2d 512, 517 (11th Cir. 1991) (statement that "appears in a daily

newspaper does not of itself establish that the stated fact is 'capable of accurate and ready

determination by resort to sources whose accuracy cannot be reasonably questioned'" and

judicial notice is improper); San Francisco v. Tutor-Saliba Corp., 218 F.R.D. 219, 222 (N.D. Cal.

2003) (judicial notice of a news article improper).

Consideration of the media reports on Defendants' motions would be improper. However, the allegations of the Complaint state a plausible claim, with or without consideration of the media reports. Particularly in the face of the Complaint's allegations that the price of NBTY stock dropped 20% following the Earnings Release that contained the subject of Rosenblatt's tip, the media reports do not prove that Defendants did not commit the insider trading alleged. Accordingly, the Court should ignore them and deny Defendants' motion to dismiss based on the adequacy of the Complaint's allegations.

**C.      Should the Court Consider the Media Reports and Convert Defendants' Motion to One for Summary Judgment, the Court Should Deny Defendants' Motion**

As a general matter, courts have discretion to consider materials outside the pleadings but, in doing so, they must convert a 12(b)(6) motion to a Rule 56 motion for summary judgment. See Global Network, 458 F.3d at 154 ("[T]he conversion of a Rule 12(b)(6) motion into one for summary judgment under Rule 56 when the court considers matters outside the pleadings is 'strictly enforce[d]' and 'mandatory.'") (citations omitted). In exercising the discretion to convert, the court must "ensur[e] that the motion is governed by the rule specifically designed for the fair resolution of the parties' competing interests at a particular stage of the litigation." Id. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56. Ziemba v. Wezner, 366 F.3d 161, 164 (2d Cir. 2004). In this case, Defendants' extraneous submissions are not sufficient to trigger a determination, at the pleading stage, that they are entitled to judgment in his favor as a matter of law. Fed. R. Civ. P. 56(e). Rather, they only highlight that issues of fact remain for litigation. Fed. R. Civ. P. 56(c) (motion must show that there is "no genuine

17

issue as to any material fact and that the moving party is entitled to a judgment as a matter of law").[9]

Defendants argue that the financial data contained in NBTY's 2004 third quarter earnings release on July 22, 2004 ("Earnings Release") was so similar to the interim results that the company released on June 17, 2004, that any attempt by the Commission to prove that the information was material and non-public must fail.[10] (Defs. Br. at 18.) The question whether the tip was material, non-public information normally is one for the trier of fact. TSC Indus. Inc. v. Northway, 426 U.S. 438, 450 (1976). Only if the information is "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality" is the ultimate issue of materiality appropriately resolved "as a matter of law" by summary judgment. Id.

### 1.    The Earnings Release Contained Material Information

Defendants ignore the uncontrovertable fact that the price of NBTY stock dropped nearly 20% following the Earnings Release.  Courts have generally recognized that the market price of a stock is affected when material information concerning a company is released.[11]  Thus, contrary to what Defendants posit (and as evidenced by Gad's own trading), the market viewed

---

[9]  The Commission submits several research reports in support of its opposition. (See Declaration of Audry Weintrob ("Weintrob Decl.").)  The Commission reserves the right to supplement its evidence and argument that the information passed was material and non-public after the benefit of discovery.

[10]  The July 22, 2004 release is attached as Exhibit I to the Declaration of Jeffrey R. Zuckerman ("Zuckerman Decl."), and the June 17, 2004 release is attached as Exhibit C.

[11]  See, e.g., SEC v. Bausch & Lomb, Inc., 565 F.2d 8, 14-15 (information is material if "reasonably certain to have a substantial effect on the market price of the security") (2d Cir. 1977) (citation omitted); Elkind v. Liggett & Myers, Inc., 635 F.2d 156, 166 (2d Cir. 1980) (same); cf. In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1425 (3rd Cir. 1997) ("In the context of an 'efficient' market, the concept of materiality translates into information that alters the price of the firm's stock .... [E]fficient markets are those in which information important to reasonable investors . . . is immediately incorporated into stock prices.").

the information in the Earnings Release to be materially different from, and worse than, what had

previously been disclosed by the company. A stock price drop of 20% negates Defendants'

arguments that the Earnings Release was immaterial as a matter of law.[12]

Defendants offer no explanation for the market's extreme reaction to NBTY's Earnings

Release, other than to attribute the decline to the Dow's 1% loss in value that day. However,

even if the market effect of 1% is subtracted from the 20% price decline in NBTY stock, the

resulting decline of 19% is still substantial and was caused by the market's reaction to the

company's disappointing Earnings Release. At the very least, a fact finder's assessment of the

Dow's 1% loss in relation to NBTY's 20% loss could well be contrary to Defendants'.[13]

Although Defendants reference RBC reports issued prior to the Earnings Release to

demonstrate their contention that the Earnings Release did not contain material, non-public

information, they fail to address analysts' reports issued <u>after</u> the Earnings Release that starkly

point out just how significant the market considered information contained in the Earnings

Release to be. At least three analysts who followed NBTY's quarterly results opined that the

company reported a significant earnings miss:

---

[12] Prior to the publication of the Earnings Release, NBTY stock had already absorbed previous news about the company. The market reacted strongly to the company's June 17, 2004 release announcing a shortfall in sales for the period April-May 2004, dropping to $26.99 from the prior day's closing of $36.50, a drop of over 26%. (Weintrob Decl. Ex. 1.) The price of the stock fell again, after the publication of a report by RBC Capital Markets ("RBC") on July 14, 2004, in which RBC found continuing weakness in sales through mid-June 2004. (Weintrob Decl. Ex. 1; Zuckerman Decl. Ex. G.) Thus, the precipitous drop of 20% following the July 22, 2004 Earnings Release must have been caused by material, non-public information contained in that Release.

[13] Defendants also argue that the drop in net income from the 2003 third-quarter was not significant because the prior period reflected an after-tax benefit, without which the 2003 quarterly earnings would have been lower than the comparable 2004 period. However, this is an argument for the fact finder, not for the Court on a Motion to Dismiss.

- Adams Harkness issued a report on July 23, 2004, noting that "[w]holesale margin weakness was negative surprise" and referred to the "dramatic decline of Rexall revenue and margin." Harkness lowered its rating, explaining that it "didn't expect anything positive from the quarterly report, but we did expect an indication that the sky wasn't falling." (Weintrob Decl. Ex. 2.)

- RBC issued a report on July 23, 2004, that noted "slower sales compounded by weak margins." RBC lowered its price target and revised downward its earnings per share estimate.[14] (Weintrob Decl. Ex. 3.)

- On July 22, 2004, Smith Barney referred to "the magnitude of the miss and apparent deteriorating trends" and placed under review its estimate for earnings per share and a target price. (Weintrob Decl. Ex. 4.)

Defendants have constructed a chart, which purportedly shows that the 2004 third quarter results were not material (Defs. Br. at 19); however, the chart is inherently inaccurate, in that it compares disparate periods.[15] Also, Defendants have selected and highlighted only that data which they believe bolsters their position.[16] The following illustrates how other information contained in the Earnings Report, misinterpreted or ignored by Defendants, not disclosed prior to the Earnings Release, and that market analysts considered important, would have caused the stock to plummet 20%:

---

[14] RBC had already lowered its quarterly estimates as new information became available during the quarter. It lowered its estimate on June 17, 2004, from $0.58 to $0.48 after the company announced the two-month sales shortfall. (Zuckerman Decl. Ex. E.) It lowered its estimate again on July 14 to $0.47 after receiving additional data concerning weak retail sales. (Id. at Ex. G.) In its July 23, 2004 report, RBC noted that the final results of $0.37 earnings per share ended up missing not only its previously lowered estimate of $0.47, but the Street estimate of $0.50. (Weintrob Decl. Ex. 3.)

[15] The data in the column labeled "June 17 Pre-announcement" is derived from the June 17, 2004 release (see Zuckerman Dec. Ex. C), and compares sales within a two-month period in 2004 with a comparable two-month period in 2003. The data in the column labeled "July 22 Q3 press release" compares sales from the 2004 third quarter with the 2003 third quarter. So the column labeled "Difference" is misleading.

[16] Defendants' focus on the results of NBTY's two smaller divisions is a red herring. As is shown in the analyst reports, the returns in those divisions were not a surprise to them and were not the focus of their concerns.

- Although Defendants characterize the 83% increase in sales in the wholesale division as an "enormous percentage increase" (Defs. Br. at 19), analysts considered that increase to be a major miss. According to RBC, the "downside to our estimate came primarily from weaker sales and gross margin in its wholesale division." (Weintrob Decl. Ex. 3.)

- The decrease in gross profit percentage for the wholesale division, a decline of 5% (which Defendants fail to mention), was significantly greater than the market had anticipated. (See Weintrob Decl. Ex. 2 (Adams Harkness report: "Wholesale margin weakness was negative surprise").)

- Defendants do not address the poor results of the Rexall business. However, analysts did, noting that "recent category weakness isn't new news, but dramatic decline of Rexall revenue and margin impairs our investment thesis that Rexall synergies will drive incremental earnings growth." (Weintrob Decl. Ex. 2.) RBC pointed out that "Rexall sales were notably weak and internal growth increased 10% (a marked deceleration in its internal revenue growth which had been tracking closer to 25%)." It noted that management had not fully explained the "deterioration." (Id. at Ex. 3.)

Finally, contrary to what Defendants maintain, it is unlikely that NBTY's settlement with the Justice Department had any material effect on the price of its stock. NBTY's Earnings Release referred to the settlement and unequivocally states that the payment had been "reserved for in a prior period and did not affect current quarter results." (Zuckerman Decl. Ex. I.) Moreover: (i) NBTY had disclosed in its public filings with the Commission the existence of the civil suit as far back as May 2003, in its quarterly report for the period ended March 31, 2003, and periodically thereafter[17]; (ii) the settlement payment of $950,000 was not likely to have been considered material for a company with over $1 billion in assets; and (iii) on July 21, following the 8:35 a.m. release announcing the settlement, NBTY's stock price opened higher than the previous day, and closed up. (Weintrob Decl. Ex. 1.) With a fuller picture, a fact finder would reasonably conclude that the announcement of the settlement had little or no effect upon the price of NBTY stock.

---

[17] See http://www.sec.gov/Archives/edgar/data/70793/000091064703000183/nbty-q2.txt.

SEC v. Hoover, 903 F. Supp. 1135 (S.D. Tex 1995), cited by defendants, is easily distinguished from the present case. The information that Hoover possessed prior to his alleged insider trading was a preliminary analysis by a company's assistant comptroller that tended to show that the company's earnings might be as much as 12% below the prior year's earnings, rather than the 10% previously disclosed. Hoover, 903 F. Supp. at 1143. A week later, the company filed a Form 8-K in which it announced its belief that results would be approximately 12% to 15% lower than previously announced. Id. Based on its analysis of all the public disclosures to the company's shareholders, the Court held that a zero to two percentage point decrease in year-end estimated earnings was not material. Id. at 1146. In doing so, the court noted there was "no evidence … that Hoover had access to the mid-month earnings information itself[;] Hoover did not see the actual documents containing the … mid-month earnings and estimates." Id. Here, by contrast, Rosenblatt saw NBTY's actual quarterly financial results that were to be announced to the public, and Rosenblatt then tipped Gad with that information.

Similarly, SEC v. Bausch & Lomb, Inc., 420 F. Supp. 1226, 1237 (S.D.N.Y. 1976), relied upon by Defendants, decidedly does not advance their argument. There, the court found that an insider's release to an analyst of an earnings estimate over the telephone "*did* constitute the disclosure of material, non-public corporate information." Bausch & Lomb, 420 F. Supp. at 1237 (emphasis added). The court emphasized: "Obviously, an estimate of earnings is among the most material of all conceivable revelations." Id. (citing TSC, 426 U.S. at 849).[18] If Bausch & Lomb supports a party's position here, it is the Commission's.

---

[18] The court found no insider trading had occurred, however, because it was not established that the stock sales at issue were made on the basis of the leaked earnings estimate. Bausch & Lomb, 420 F. Supp. at 1239.

## 2.   The Earnings Release Contained Non-Public Information

Defendants argue that the substance of the Earnings Release was already public because

NBTY's June 17, 2004 announcement predicted that a slowdown in sales would continue.  (See

Zuckerman Decl. Ex. C.)  However, that NBTY's Earnings Report contained information that

took the market by surprise is evidenced by the market reaction and analysts' commentary.

Moreover, Defendants' argument fails because it would not have mattered whether the numbers

were substantially the same as before, worse, or even better.  The determining factor is that the

*actual* financial results were not public until the company released them.  Defendants concede, as

they must, that the Earnings Release "no doubt added some certainty and detail to what was

known about the Company's Third Quarter performance." (Defs. Br. at 21.)  Indeed, Defendants

simply cannot dispute that the disclosure of the quarterly earnings in the July 22, 2004 Release

was the first time that that the public had access to the *actual* financial results.  Second Circuit

precedent establishes that such earnings information is inherently material.[19]

## III.   IF THE COURT GRANTS DEFENDANTS' MOTION, THE COMMISSION SHOULD BE AFFORDED AN OPPORTUNITY TO REPLEAD

If the Court determines that Defendants' motions should be granted, the Commission

requests leave to replead.  Leave to amend is "almost always" granted to plaintiffs whose claims

are dismissed under Rule 9(b).  Luce v. Edelstein, 802 F.2d 49, 56 (2d Cir. 1986) (citations

omitted); accord Wight v. Bankamerica Corp., 219 F.3d 79, 91 (2d Cir. 2000) (reversing lower

court's denial of leave to amend in dismissing claim under Rule 9(b)).  Indeed, in those cases

---

[19] See, e.g., SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 849 (2d Cir. 1968) (en banc) ("material facts include ... information disclosing the earnings and distributions of a company "); Ganino v. Citizens Utils. Co., 228 F.3d 154, 164 (2d Cir. 2000) ("earnings reports are among the pieces of data that investors find most relevant to their investment decisions") (quotation omitted); Bausch & Lomb, Inc., 420 F. Supp. at 1238 ("Obviously, an estimate of earnings is among the most material of all conceivable revelations").

relied upon by Defendants here, plaintiffs were granted leave to file an amended complaint after

the original complaint was dismissed under Rules 9(b) and 12(b)(6). <u>Stromfeld</u>, 496 F. Supp. at

1084; <u>Log on Am.</u>, 223 F. Supp. 2d at 452. Only where plaintiffs have already been granted an

opportunity to address deficiencies in a complaint, and have failed to provide the required

specificity in an amended pleading, should the Court deny them further leave to amend. <u>See</u>, <u>e.g.</u>,

<u>O'Brien v. Price Waterhouse</u>, 740 F. Supp. 276, 284 (S.D.N.Y. 1990) (plaintiff's third amended

complaint properly dismissed without leave to replead since plaintiff had already had an

opportunity to cure deficiencies in response to earlier 9(b) motion), <u>aff'd</u>, 936 F.2d 674 (2d Cir.

1991).

## CONCLUSION

For all the foregoing reasons, Plaintiff respectfully requests that the Court deny

Defendants' Motions in all respects. If the Court should grant the Motions, Plaintiff respectfully

requests that it be granted the right to amend its Complaint.


Dated:        New York, New York
              November 14, 2007

                          Respectfully submitted,


              By:         _____
                          VALERIE A. SZCZEPANIK
                          AUDRY WEINTROB
                          Counsel for Plaintiff
                          SECURITIES AND EXCHANGE COMMISSION
                          New York Regional Office
                          3 World Financial Center – Room 400
                          New York, New York 10281-1022
                          Ph: (212) 336-0175
                          Fx: (212) 336-1317
                          szczepanikv@sec.gov